**In the Matter of J.G.**

No. 04–04–00520–CV.

Court of Appeals of Texas, San Antonio.

Feb. 1, 2006.

Rehearing Overruled April 6, 2006.

Jose E. Barrera, Law Office of Jose Barrera, Corpus Christi, for appellant.

George P. Morrill, II, Dist. Atty., Martha Warner, Asst. Dist. Atty., Beeville, for appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, KAREN ANGELINI, Justice, PHYLIS J. SPEEDLIN, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

J.G., a juvenile, was adjudicated to have engaged in delinquent conduct by committing aggravated sexual assault and was placed in the custody of the Texas Youth Commission with a possible transfer to the Institutional Division of the Texas Department of Criminal Justice for a period of ten years and one day. J.G. appeals, bringing the following issues: (1) whether the trial court should have allowed the complainant's mother to testify as an outcry witness; (2) whether the trial court committed fundamental error by commenting on the weight and credibility of the evidence; (3) whether the trial court should have allowed the State to amend its petition without re-certification by the grand jury; (4) whether the trial court should have allowed defense witnesses to offer rebuttal testimony; (5) whether the trial court allowed the State to bolster the complainant's testimony; (6) whether the trial court committed reversible error by allowing excessive leading questions; (7) whether the evidence is factually sufficient to support the finding that J.G. committed aggravated sexual assault; and (8) whether the trial court abused its discretion in finding that reasonable efforts were made to prevent or eliminate the need for J.G.'s removal from his home. Because the trial court did not commit reversible error and because the evidence is factually sufficient, we affirm the trial court's judgment.

### BACKGROUND

On December 10, 2003, Z.H., the complainant, a five-year-old boy, was questioned by his kindergarten teacher, Mrs. Pennington. Mrs. Pennington had received a report that Z.H. was rubbing his genital area in class and had asked a classmate to watch him. Because Z.H. wanted another child to observe him, Mrs. Pennington, an educator of thirty-three years, recognized that Z.H. could be acting out sexually as a result of sexual abuse. Mrs. Pennington took Z.H. into the hall and asked him from whom he had learned the behavior. According to Mrs. Pennington, Z.H. clearly and unequivocally stated the first name of J.G., a twelve year-old boy. At the end of the school day, Mrs. Pennington approached Z.H.'s mom, Regina H., and informed her of the event.

In response, Regina H. asked Z.H. if anyone had ever touched his private parts. He answered, "Yes, [J.G.]." Regina H. asked what he meant, and Z.H. rubbed his penis with a rubbing motion and said, "[J.G.] touched my private parts. He touched my penis." Regina H. called the local police and spoke with Sheriff Bruce Thomas. She also took Z.H. to the Chil-

dren's Advocacy Center in Corpus Christi where he met with a counselor who interviewed him. During the interview, E.M., a six-year-old girl, was mentioned as a potential witness to the alleged event between Z.H. and J.G. E.M. was then brought to the child advocacy center; she indicated that oral sex had occurred between Z.H. and J.G. When informed of E.M.'s statements, Regina H. asked Z.H., "Did [J.G.] put his penis in your mouth?" According to Regina H., Z.H. turned bright red, hung his head, began to cry, and admitted that J.G. had done so.

Realizing the extent of J.G.'s alleged behavior, Regina H. remembered a suspicious incident involving Z.H. and J.G. According to Regina H., the two boys were in her bedroom fully clothed when J.G. offered to take Z.H. to his bedroom to read to him. Regina H. thought it strange that Z.H. did not want to go with J.G. because Z.H. "usually, you know, would want to play with anybody." The boys went into Z.H.'s room and closed the door. When Regina H. went to check on them about ten minutes later, she found the door barricaded. She asked what was blocking the door and demanded that the boys open the door immediately. It took a while, however, for the boys to open the door. Upon entering Z.H.'s bedroom, Regina H. found Z.H. in his underwear and J.G. lying on the floor. Initially, Regina H. thought that the boys had been watching a movie they were not allowed to watch or playing an unauthorized video game. As such, she did not report the incident.

During Z.H.'s testimony, he described a day where he, J.G., and E.M. were playing in his bedroom. According to Z.H., J.G. forced his penis into Z.H.'s mouth. J.G. threatened Z.H. that Z.H. would get in trouble if he told anyone. According to Z.H., he was afraid of J.G. and thought that J.G. would assault E.M. as well. Af-

ter some questioning by the State, Z.H. corroborated Regina H.'s testimony regarding the "barricaded door" incident, which was a separate incident from the alleged assault. When cross-examined, Z.H. admitted that he had told his mother that the assaults had occurred "seventy-thousand times."

After the initial outcry and visit to the advocacy center, Z.H. saw Paula Rosenstein, a licensed clinical practitioner at Family Counseling Service in Corpus Christi. According to Rosenstein, most outcries are "accidental." That is, a person asks the right question at the right time and "everything comes tumbling out." In Z.H.'s case, the outcry was a result of being caught in class.

Rosenstein described the relationship between perpetrators and victims as one which has a traumatic bond. According to Rosenstein, Z.H. exhibited characteristics of abuse in the form of fear, anxiety, bedwetting, and self-blame. She indicated that although Z.H. could not recall certain dates, children commonly cannot recall dates because they have a different concept of time than adults and they often suppress traumatic events. Thus, if a child said that he was abused seventy-thousand times, in a child's mind, that would just mean that the abuse happened on many different occasions.

At trial, J.G. testified in his own defense. According to J.G., he had only been to Z.H.'s house on two different occasions. On one of those occasions, J.G. testified that he witnessed Z.H. and E.M. hugging and kissing and saw them go into a closet together. According to J.G., when he told Regina H. about the event, she told him to "stop lying," and he left. J.G. repeatedly denied assaulting Z.H.

## ADMISSIBILITY OF THE OUTCRY STATEMENT

At trial, Regina H., Z.H.'s mother, testified about outcry statements made by Z.H.

According to J.G., this testimony should not have been allowed for the following reasons: (1) Regina H. was not a proper outcry witness because she was not the first adult to whom Z.H. cried out; (2) Regina H.'s testimony was not reliable as to time, content, and circumstances; (3) Z.H. was not available to testify at the pretrial hearing to determine the reliability of the outcry statement; and (4) there was an eyewitness to the alleged crime. Additionally, J.G. complains that Regina H. improperly testified to extraneous offenses. For the reasons below, we hold that all of J.G.'s issues lack merit.

### A. Standard of Review

■ The outcry statute found in section 54.031 of the Juvenile Justice Code should be interpreted and applied in a juvenile trial in the same manner as the parallel rule in the Code of Criminal Procedure is applied in an adult criminal trial. *In re Z.L.B.*, 102 S.W.3d 120, 123 (Tex.2003). Section 54.031 creates an exception to the general rule excluding hearsay for the first report of sexual abuse that a child victim makes to an adult:

> This section applies only to statements that describe the alleged violation that:
>
> (1) were made by the child who is the alleged victim of the violation; and
>
> (2) were made to the first person, 18 years of age or older, to whom the child made a statement about the violation.

TEX. FAM.CODE ANN. § 54.031(b) (Vernon 2002). For the exception to apply, (1) the State must provide the defendant with at least fourteen days' notice of its intent to offer the statement, the name of the witness who will testify about the statement, and a written summary of the statement; (2) in a hearing outside the presence of the jury, the trial court must determine that the statement is reliable based on the time,

content, and circumstances of the statement; and (3) the child who is the alleged victim must testify or be available to testify at the hearing or in any other manner provided by law. *See id.* § 54.031(c).

■ The trial court has broad discretion in considering whether a child's statement falls within the hearsay exception provided by section 54.031, and the trial court's exercise of that discretion will not be disturbed on appeal unless a clear abuse of discretion is established by the record. *See Garcia v. State*, 792 S.W.2d 88, 92 (Tex.Crim.App.1990); *Davidson v. State*, 80 S.W.3d 132, 139 (Tex.App.-Texarkana 2002, pet. ref'd); *Reed v. State*, 974 S.W.2d 838, 841 (Tex.App.-San Antonio 1998, pet. ref'd).

### B. Discussion

#### 1. Was Regina H. the proper outcry witness?

■ According to J.G., because Z.H. mentioned J.G.'s name when Mrs. Pennington questioned him, because Z.H. talked to a counselor at the Child Advocacy Center, and because Z.H. talked to J.G.'s mother, Regina H. was not the proper person to testify as the outcry witness. We disagree.

■ While J.G. correctly states that section 54.031's exception applies to statements made to the first adult a child confides in, he omits the rest of the statute's language. Section 54.031's exception applies to "statements that . . . were made to the first person, 18 years of age or older, to whom the child made a statement *about the violation.*" TEX. FAM.CODE ANN. § 54.031(b)(2) (Vernon 2002) (emphasis added). An outcry witness is not person-specific but event-specific. *Broderick v. State*, 35 S.W.3d 67, 73 (Tex.App.-Texarkana 2000, pet. ref'd). The proper outcry witness to a single event is the first adult

person other than the defendant to whom the victim made a statement describing the violation in question. *Id.* at 73–74. The statement must be one that "in some discernible manner describes the alleged offense," more than just "words which give a general allusion that something in the area of child abuse was going on." *In re Z.L.B.,* 102 S.W.3d at 122; *In re E.P.C.,* No. 04–02–00086–CV, 2003 WL 1611415, at *4 (Tex.App.-San Antonio 2003, pet. denied).

■ Here, the relevant event is the alleged aggravated sexual assault; that is, the oral sex incident. Z.H. said to Mrs. Pennington that he had learned his behavior from J.G. He told the counselors at the Child Advocacy Center about some touching. The record is not clear as to what Z.H. told J.G.'s mother. Z.H. testified generally that he told J.G.'s mother "what [J.G.] did." And, although J.G.'s mother testified, she did not testify as to what Z.H. told her. The record, however, does clearly reflect that the first person told of the incident involving oral sex was Regina H., Z.H.'s mother. When a child discloses a general allusion of abuse to an adult, rather than a clear description of the event, that adult is not the proper outcry witness. *In re Z.L.B.,* 102 S.W.3d at 122; *In re E.P.C.,* 2003 WL 1611415, at *4. Because Z.H. first described the incident involving the aggravated sexual assault to Regina H., the court did not abuse its discretion in determining that she was the proper outcry witness.

*2. Were Regina H.'s statements reliable as to time, content, and circumstances?*

■ J.G. also argues that the trial court erred in finding that the outcry statement was reliable as to time, content, and circumstances. At the hearing, Regina H. testified; two affidavits prepared by her describing Z.H.'s outcry statements were admitted in evidence. The first affidavit was prepared by Regina H. on December 16, 2003, shortly after Z.H. first made a statement to her about the alleged abuse. In this affidavit, Regina H. describes having been told by Mrs. Pennington, on December 10, 2003, of Z.H. "playing with himself." When Regina H. questioned Z.H. if anyone had ever touched his "private parts," Z.H. replied that J.G. had done so on two occasions. According to Regina H., one of those occasions was the "door barricading" incident.

After Regina H. and Z.H. went to the advocacy center, Z.H. then made a second outcry to Regina H. This second outcry is reflected in Regina H.'s second affidavit, prepared on January 8, 2004. According to Regina H., Z.H. told her that E.M., another minor, was present on one of the occasions of abuse and had seen J.G. put his penis in Z.H.'s mouth. When Regina H. asked why Z.H. had not told her this earlier, Z.H. replied that J.G. had "warned him several times that [Z.H.] was the bad one because he had done that to [J.G.]" Z.H. told her that J.G. had "told [Z.H.] that he would get in a lot of trouble because [J.G.] would tell [sic] that [Z.H.] had done a bad thing to him." According to Regina H.'s affidavit, Z.H. then "hung his head and just said he was scared." After the hearing, the trial court determined that the outcry statements were reliable.

■ Pursuant to section 54.031, the trial court must conduct an inquiry into the reliability of the outcry statement, examining the "time, content, and circumstances of the statement." Tex. Fam.Code Ann. § 54.031(c)(2) (Vernon 2002). The phrase "time, content, and circumstances" refers to "the time the child's statement was made to the outcry witness, the content of the child's statement, and the circumstances surrounding the making of

that statement." *Broderick v. State*, 89 S.W.3d 696, 699 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd). Although courts have enumerated factors that may assist in ascertaining the reliability of an outcry statement, the focus of the inquiry must remain upon the outcry statement, not the abuse itself. *Id.* A child's outcry statement may be held reliable even when it contains vague or inconsistent statements about the actual details of the sexual abuse. *Id.*

J.G. argues that the outcry statement is unreliable because the content of Regina H.'s first affidavit does not conform with the petition. According to J.G., although the petition alleges that J.G. caused Z.H.'s mouth to be penetrated by the sexual organ of J.G., Regina H.'s first affidavit does not mention oral sex. And, J.G. emphasizes that Regina H.'s first affidavit does not mention E.M. while the second one does. Thus, he argues that the outcry statement is unreliable. We disagree.

The first affidavit did not mention oral sex or E.M. because Z.H. did not tell Regina H. about this incident until after the first affidavit was prepared. Regina H.'s second affidavit explains the sequence of events. After Z.H. gave his first recorded statement, she asked him what E.M. had seen. Z.H. said that he had told Regina H. "everything"; however, later he told Regina H. that J.G. had tried to make him and E.M. touch one another. Days later, Regina H. was told by Sheriff Thomas that E.M. had mentioned that "oral sex" was involved. Regina H. then asked Z.H. if J.G. had put his penis in Z.H.'s mouth:

> He turned bright red and said yes. I asked him why he didn't tell us earlier and he said that [J.G.] had warned him several times that [Z.H.] was the bad one because he had done that to [J.G.]

He told us that [J.G.] told him that he [Z.H.] would get in a lot of trouble because [J.G.] would tell that [Z.H.] had done a bad thing to him. Then [Z.H.] hung his head and just said that he was scared.

Thus, the second affidavit does describe the oral sex allegation.[1]

■ J.G. also complains that Regina H. only learned about the oral sex allegation because she directly questioned Z.H. about oral sex. However, an examination of the record reveals that although Regina H. asked Z.H. if oral sex occurred, when asked, Z.H. immediately turned red, began to cry, and admitted that the offense had occurred. As such, the trial court was within its discretion to determine that the outcry statement was reliable.

■ Finally, J.G. argues that the outcry statement is unreliable as to "time" because the written outcry statement provides that the incident occurred about three weeks before December 10, 2003, while the petition alleging delinquent conduct states that the incident occurred on or about October 18, 2003. Section 54.031's "time" requirement, however, does not refer to the date of the incident; instead it refers to "the time the child's statement was made to the outcry witness." *Broderick*, 89 S.W.3d at 699. Nevertheless, J.G. argues that the outcry statement is unreliable as to time: "The statements must conform with the petition because they must describe 'the alleged violation.'"

■ The outcry statement must be one that "in some discernible manner describes the alleged offense," more than just "words which give the general allusion that something in the area of child abuse was

---

1. These two affidavits were admitted in evidence at the pre-trial hearing on whether the outcry statements were reliable. They were not, however, admitted in evidence at trial.

going on." *In re Z.L.B.*, 102 S.W.3d at 122. Here, Z.H.'s statements to Regina H. did much more than "give the general allusion that something in the area of child abuse was going on." Z.H. told Regina H. that J.G. put his penis in Z.H.'s mouth. We find no abuse of discretion on the part of the trial court in determining that the outcry statement described the alleged violation.

*3. Did the trial court err in admitting the outcry statement because Z.H. was not available to testify at the pre-trial hearing?*

■■■ J.G. argues that because Z.H. was not available to testify at the pre-trial hearing to determine the admissibility of the outcry statement, the statement was improperly admitted. We disagree.

According to the Texas Juvenile Justice Code, in order to admit hearsay evidence of a child abuse victim, the court must conduct a hearing, outside the presence of the jury, to determine the reliability of the outcry statement. Tex. Fam.Code Ann. § 54.031(c)(2) (Vernon 2002). Along with other criteria, the statute provides that the statement is admissible if, "the child who is the alleged victim testifies or is available to testify at the hearing in court or in any other manner provided by law." *Id.* § 54.031(c)(3).

Here, at the hearing, the court and the parties discussed whether the child, since he was going to testify at trial, needed to be present at the pre-trial hearing:

State: I guess we'll have another hearing with the child present outside the presence of the jury on Monday.

Court: Why?

State: Or Tuesday. Because you just told me—

Court: No—

State: —got to be outside the presence of the jury.

Court: Not that part.

Defense: Not the child's testimony.

Court: Not the child's part. The child's part has got to be before the jury.

State: But you said that the child will testify or is available to testify.

Defense: But it'd be if she [the judge] makes a determination that he's [Z.H.] unavailable for whatever reason. I mean you're telling us he's going to testify [at trial].

State: Right. And if he [Z.H.] gets in here and he testifies . . .

Court: The statements are admissible.

Defense: Yeah, and then she [Regina H.] can testify as to the hearsay part; in other words, he [Z.H.] outcried to her.

State: Correct. So are we saying the same thing?

Defense: Yeah. I mean, you can't put her [Regina H.] on and not the child [Z.H.].

They went on to further discuss whether Z.H. needed to be present at the pre-trial hearing:

Court: But I have to make that determination before the hearsay is brought into the courtroom in my opinion.

Defense: Yeah, you have to make a determination that the child is available, at least available to testify or has testified, and that the outcry statement is reliable based on time, content, and circumstances.

Court: But I don't know how I can make that determination without having the child.

State: Well—okay.

Court: That's the problem.

Defense: Yeah, I mean, if you don't know what the child's going to say.

State: Doesn't matter what the child says.

Court: It doesn't matter what the child says at all.

State: And so assuming I have a live child here on Monday or Tuesday when we start our evidence—

Court: We're starting on Monday.

State: Monday; okay. When we have that child available to testify, at that point in time I will have him here ready to go. At that point we would ask the Court to make the findings that the statement is reliable.

J.G.'s attorney then objected to the child not being present, and the court explained that the outcry witness would only be allowed to testify if the child testified at trial. If, however, the child did not testify, then the court would not allow the outcry witness to testify.

At trial, J.G.'s attorney again objected to the child not being present at the pre-trial hearing:

Defense: Judge, [Z.H.] wasn't present. That's one of the requirements, that he was not [sic] present during that hearing. And so just for the record that he wasn't here at the time that the hearing was on April 14th. He wasn't present and available to testify at the hearing.

Court: Okay. And I thought we agreed that we'd make this determination because if he's unable to testify, then we won't have the outcry witness come in.

Defense: Well, I have some other—I mean, the way I read—I'll show you the Family Code. The way I read it is that the child has to be available— either testify or be available at the hearing on the outcry statement, not at some future date.

Court: Mr. Bellows [defense counsel], we went over this last week. You want me to bring the child in now or do you want to do it later? I don't care. What's your option? I'm leaving it up to you, Mr. Bellows....

Defense: Well, we had a hearing on April 14th. The child was not there and was not available to testify.

Court: *No, that is incorrect.* That's an incorrect statement of the law—I mean, of the facts. The child was not here. *He was not unavailable to testify.*

Defense: He was not present; that he was not to [sic] testify or available to testify.

Court: I disagree. He was not present. *There was no finding made by this Court he was unavailable* and I'm not going to allow you to change those words. He was not here. *We agreed that it would not matter.* He could have been there at that hearing and still unavailable to testify at this hearing, then the outcry doesn't come in. So it doesn't matter at pretrial whether the child's present or not. It's what happens today. So if you want me to make the determination he's available to testify today, I'll be glad to do so.

Defense: You can make your determination, but it's my understanding he had to be available to testify at the hearing and he was not available to testify. He wasn't in the courtroom; he was at school—

Court: *And that's very available, Mr. Bellows.*

(emphasis added). The trial court then asked defense counsel whether he would like to examine the child outside the presence of the jury. Defense counsel responded, "I think it's too late to have that."

While the record reflects that Z.H. was not present at the pre-trial hearing, it does not reflect that he was unavailable. We, therefore, cannot find any error on the part of the trial court.

Moreover, J.G. argues that he is harmed by Z.H.'s failure to be present at the pre-trial hearing because if Z.H. had testified at the pre-trial hearing, then the court would have heard "the wide-ranging discrepancies between [Regina H.]'s testimony and Z.H.'s testimony." And, had the court heard these discrepancies, it would have excluded Regina H.'s testimony as unreliable. However, at trial before Regina H. and Z.H. testified, the trial court gave defense counsel an opportunity to examine Z.H. outside the presence of the jury. Instead of taking this opportunity to show the trial court these "wide-ranging discrepancies," defense counsel responded that it was "too late."

Further, Z.H. testified at trial. Any error caused by Z.H. not being physically present at the pre-trial hearing was cured when Z.H. testified at trial on both direct and cross-examination. *See Morales v. State*, No. 04–02–00342–CR, 2003 WL 22715602, at *5 (Tex.App.-San Antonio 2003, pet. ref'd); *see also Thompson v. State*, 665 S.W.2d 188, 190 (Tex.App.-Houston [1st Dist.] 1984, no pet.). The rationale for the exclusion of hearsay involves the fear of unreliability stemming from the lack of opportunity for opposing counsel to cross-examine the author of the out-of-court statements and lack of opportunity for the jury to observe the demeanor of this person during testimony under oath. *Morales*, 2003 WL 22715602, at *5. In this case, Z.H. was available throughout the trial for further examination before a jury capable of observing his demeanor and assessing his credibility. Therefore, the usual reason for excluding these statements was not present in this case, and any error was harmless.

*4. Did Regina H. improperly testify to extraneous offenses during her testimony?*

J.G. complains that Regina H. was allowed to testify at trial about an extraneous offense. At trial, Regina H. described an incident during which she allowed Z.H. and J.G. to play in Z.H.'s room. When she went to check on the boys, the door to Z.H.'s bedroom was blocked. J.G. asserts that this testimony is evidence of another "bad act" on J.G.'s part and that the State should have offered it under Texas Rule of Evidence 404(b). To preserve error for appeal, the record must show that J.G. made a timely objection stating "the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX.R.APP. P. 33.1(a).

Here, J.G. claims that he objected at the pre-trial hearing and at trial, thus preserving error for appeal. We disagree. J.G. objected to the reliability of the outcry statement; he did not object to the admission of extraneous bad acts under rule 404(b). As such, the issue as not been preserved for appeal.

*5. Did the trial court err in allowing an outcry statement when there was an alleged eyewitness to the crime?*

J.G. contends that "the trial court erred when it allowed an outcry statement because the State had an alleged eyewitness to the crime." For support, J.G. cites *Brown v. State*, 649 S.W.2d 160 (Tex.App.-Austin 1983, no pet.), which he claims stands for the proposition that the "outcry statute allows outcry testimony only when the State seeks a conviction on uncorroborated testimony of a child." We disagree with this assertion.

In *Brown*, the defendant argued that the testimony of the victim's father was inadmissible hearsay; the State responded that the father's testimony was admissible pursuant to article 38.07 of the Texas Code of Criminal Procedure. *Id.* at 161–62. At the time *Brown* was decided, article 38.07 provided the following:

A conviction under Chapter 21, Penal Code is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within six months after the date on which the offense is alleged to have occurred.

*Id.* at 162.[2] The court in *Brown* explained that because the State produced an eyewitness to the offense (aside from the victim), it had not sought a conviction on the "uncorroborated testimony of the victim of the sexual offense." *Id.* Thus, the court held that article 38.07 was inapplicable, and the father's testimony was improperly admitted. *Id.*

While we agree that article 38.07 is inapplicable to this case, we disagree that because article 38.07 was inapplicable, Regina H.'s testimony was inadmissible hearsay. The current version of article 38.07 explicitly states that the "requirement that the victim inform another person of an alleged offense does not apply if at the

time of the alleged offense the victim was a person: (1) 17 years of age or younger ...." Tex.Code Crim. Proc. Ann. art. 38.07(b)(1) (Vernon Supp.2004–05). Thus, like in *Brown*, article 38.07 is not applicable. However, unlike in *Brown*, Regina H.'s testimony was admitted as an exception to hearsay under another statute: section 54.031 of the Juvenile Justice Code, the equivalent of which for an adult defendant is article 38.072 of the Texas Code of Criminal Procedure.[3]

In *Martinez v. State*, 178 S.W.3d 806 (Tex.Crim.App.2005), the court of criminal appeals recently explained the confusion regarding article 38.07 and article 38.072. According to the court, article 38.072 is a rule of *admissibility* of hearsay evidence, while article 38.07 is a rule concerning *sufficiency* of the evidence:

Hearsay statements, while generally inadmissible, may be admitted under specific conditions when public policy supports their use, and the circumstances surrounding the making of those statements pedigree their reliability. The enactment of article 38.072 is a legislative determination that one such specific situation is the outcry statement of a child victim of sexual or physical abuse.... Thus, article 38.072 is a rule of evidence admissibility, allowing trial courts to admit some hearsay state-

---

**2.** The current version of article 38.07 provides the following:

(a) A conviction under Chapter 21, Section 22.011, or Section, 22.021, Penal Code, is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within one year after the date on which the offense is alleged to have occurred.

(b) The requirement that the victim inform another person of an alleged offense does not apply if at the time of the alleged offense the victim was a person:

(1) *17 years of age or younger;*

(2) 65 years of age or older; or

(3) 18 years of age or older who by reason of age or physical or mental disease, defect, or injury was substantially unable to satisfy the person's need for food, shelter, medical care, or protection from harm.

Tex.Code Crim. Proc. Ann. art. 38.07 (Vernon Supp.2004–05) (emphasis added).

**3.** As noted previously, the Texas Supreme Court has held that "the outcry statement should be interpreted no differently in a juvenile trial than in an adult criminal trial." *In re Z.L.B.*, 102 S.W.3d 120, 123 (Tex.2003).

ments in the prosecution of certain offenses against children when those statements are made under the specified conditions....

Article 38.07 differs from article 38.072 in several essential respects. While article 38.072 assists the prosecution by making certain hearsay outcry statements admissible, article 38.07 protects the accused by creating a statutory corroboration requirement. Its purpose is almost exactly opposite to that of article 38.072: this is a defendant-protecting statute, rather than a child-victim-protecting statute. It limits the circumstances in which the State may obtain a conviction for sexual offenses based on the testimony of a competent adult to situations in which: (1) the victim made an outcry within one year of the criminal act; or (2) there is other evidence that corroborates the victim's testimony.... Thus, article 38.07 requires the State to offer some corroborative evidence, such as eyewitness testimony, a defendant's admissions, medical testimony, or other circumstantial proof, if the competent adult complainant in a sexual assault prosecution has not informed any adult, other than the defendant, of the alleged offense within a year of its commission. *Of course, if the victim's statements to that witness are otherwise admissible under the hearsay rule, then the witness may recount the victim's outcry.* But article 38.07 is not itself an exception to the hearsay rule.

In sum, article 38.07 deals with the *sufficiency* of evidence required to sustain a conviction for sexual assault but does not act as a hearsay exception, while article 38.072 deals with the *admissibility* of evidence that would otherwise be barred by the hearsay rule.

*Id.* at 810–14 (emphasis added).

In *Martinez*, the defendant argued that the testimony of the victim's mother was

inadmissible hearsay. *Id.* at 814. When the assault occurred, the victim was thirteen years old; because article 38.072 applies only if the victim is twelve years of age or younger at the time of the offense, the statement was not admissible hearsay under article 38.072. *Id.* Thus, the court of criminal appeals explained that the court of appeals was correct in finding that the statement was inadmissible under article 38.072; however, the court of appeals was wrong in determining that the mother's testimony "was admissible under the general outcry statute, Code of Criminal Procedure Article 38.07, and the trial court strictly limited the testimony to its proper scope." *Id.* The court of criminal appeals explained that this conclusion by the court of appeals was incorrect: Because the victim fit within one of the article 38.07(b) exceptions—she was younger than seventeen at the time of the offense—the State was not required to prove that the victim made any outcry statement. *Id.* As such, the mother's testimony was neither necessary nor admissible under article 38.07. *Id.* Article 38.07 simply did not apply to the case. And, although "evidence that is otherwise admissible under a hearsay exception or exemption is not barred by article 38.07," the record did not reflect such an exception or exemption. *Id.* at 814–15 As such, the court of criminal appeals held that the testimony was inadmissible hearsay. *Id.*

Like in *Martinez*, here, Z.H. was younger than seventeen years of age at the time of the offense; thus, the same article 38.07(b) exception applies. And, because Z.H. fits within the exception, article 38.07 does not apply to this case. However, unlike in *Martinez*, because Z.H. is a child of twelve years of age or younger, the juvenile version of article 38.072, section 54.031 of the Juvenile Justice Code, does

apply. Because section 54.031 applies, Regina H.'s testimony was admissible hearsay. *See Martinez,* 178 S.W.3d at 814 ("Of course, evidence that is otherwise admissible under a hearsay exception or exemption is not barred by article 38.07.").

### COMMENTING ON THE WEIGHT OF THE EVIDENCE

J.G. argues that the trial court committed fundamental error because it commented on the weight and credibility of the evidence. Article 38.05 of the Texas Code of Criminal Procedure prohibits a trial court from discussing or commenting on the weight of the evidence: "In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he ... make any remark calculated to convey to the jury his opinion of the case." TEX. CODE CRIM. PROC. ANN. art. 38.05 (Vernon 1979). However, to preserve error, a defendant must make a timely objection that the trial court's comments violate article 38.05. *See* TEX.R.APP. P. 33.1. Here, there was no such objection.

Nevertheless, relying on *Blue v. State,* 41 S.W.3d 129 (Tex.Crim.App.2000) (plurality op.), J.G. argues that the trial court's comments in this case constituted fundamental error. In *Blue,* a plurality of the judges on the Texas Court of Criminal Appeals held that the trial judge's comments before the jury, which tainted defendant's presumption of innocence, amounted to fundamental error; because the comments were fundamental error, no objection was necessary to preserve error. *Id.* at 132–33. Another judge, concurring in the judgment, wrote that the right at issue was the fundamental right to an impartial judge, and as such, no objection was required. *Id.* at 138 (Keasler, J., concurring). Thus, the issue in *Blue* concerned the tremendous influence the trial judge has on a jury and the effect of the trial judge's comments.

### A. Comments to Witnesses

■ First, J.G. complains of the trial court thanking E.M., a six-year-old witness, for her testimony as she was leaving the witness stand: "All right, [E.M.]. Thank you very much. You answered the questions just right. Thank you. You can go." As E.M. descended the witness stand, the prosecution asked the court if she could be excused from the courthouse. The court responded, "Surely. You feeling bad?" E.M. nodded her head. The prosecutor responded, "I hope you feel better." *Id.* It is clear from the trial record that E.M. was exhibiting some anxiety and that the court's comments were intended to reassure her and make her feel better. The trial court's comments do not rise to the level of fundamental error.

■ Second, J.G. complains of the trial court's comments to Z.H., also a six-year-old witness. As Z.H. approached the witness stand, the trial court called him "babe": "[Z.H.], do you know where to go? Right up here, babe." As Z.H. began his testimony, the trial court told him, "Very good":

Court: What's your middle name?

Z.H.: [Z.D.H.]

Court: Very good.

Z.H.: [H.] is my last name.

Court: Very good. You just need to talk real slow because all these people need to hear you. There's a lot of people. So I'm going to let [the prosecutor] ask you some questions and if you talk too fast, we're going to make you do it slow.

Z.H.: Okay.

When read in the proper context, it is apparent that these comments do not constitute fundamental error. The trial court was merely trying to assist a young witness while simultaneously easing the witness's apprehensions about testifying. We cannot read the trial court's comments separate from the understanding that these two witnesses were both six years of age at the time of trial. Telling a six year-old that he had done "very good" because he recited his full name or calling him "babe" does not taint the defendant's presumption of innocence.

■■■■ Finally, J.G. complains of the trial court "offering to help" Z.H. J.G. does not specify how the trial court offered to help, but merely points to the following portion of the record:

State: Okay. So people borrow your movies.

Z.H.: Uh-huh.

State: Do people also borrow some of your games?

Z.H.: Yeah.

State: What kind of games do you have?

Z.H.: (Indistinguishable)

Court: Too many questions, Martha [the prosecutor].

State: That's too many questions. Let me ask you. Do you have a Game Boy?

Z.H.: Yeah. It's right in the room down there.

Court: You brought it down there?

Z.H.: Yeah.

State: Okay. And do you play with that game?

Z.H.: Yeah. I would end up playing my sonic battles. (Interruption by Court Reporter)

Court: "Sonic Battles." Just give me a chance. I've got the same-aged child. I can help a lot.

State: Now, [Z.H.], do you remember when [E.M.] was at your house and you were watching *Eight–Legged Freaks?* Was there . . .

Reviewing the record, it appears that, rather than aiding the prosecution, the trial court was merely trying to expedite the trial. *See Jasper v. State,* 61 S.W.3d 413, 421 (Tex.Crim.App.2001) (holding that "a trial judge has broad discretion in maintaining control and expediting the trial"). These comments by the trial court do not rise to fundamental error.

### B. Comments to Defense Counsel

■■■■ Finally, J.G. complains of the trial court ordering J.G.'s trial counsel to sit down and telling defense counsel that he could "take it up to the appellate court." According to J.G., by stating that the case would be appealed, the trial court was implicitly telling the jury that the allegations against J.G. were true.

During the State's second direct examination of Paula Rosenstein, which lasted only a few minutes, J.G.'s attorney made twelve objections; ten for leading and two for non-responsive answers. Only two of these objections were sustained; the other ten were overruled. The court had to ask J.G.'s attorney to sit down five times. Then, the following exchange occurred:

Defense: Judge, I can't—Judge, once again, it's a leading question. She's suggesting the answer.

Court: I don't hear the suggestion that you keep hearing, Mr. Bellows, so I'm overruling your objection. She's not saying "didn't." She's not doing that. She does need to rephrase them a little bit better, but they're basically okay. They're not great questions, but they're okay. So that's why I'm going to keep overruling you.

Defense: Judge, okay.

Court: You keep objecting, and I'll tell you. But make your objection; I make my ruling; you sit down. That's why I'm upset. You're not sitting down once I make my ruling. Just take it up to the appellate court.

J.G. relies on two cases for support: *Jones v. State*, 788 S.W.2d 834 (Tex.App.-Dallas 1990, no pet.), and *Hernandez v. State*, 507 S.W.2d 209 (Tex.Crim.App. 1974). In both of these cases, the trial court's comments were found to be erroneous.

In *Jones*, during a break in jury deliberations, the trial court stated,

Why don't we take a break and give it up for the evening? How does that sound? We have to go into the second phase tomorrow so we wouldn't be able to finish … The second phase of the trial is going to be the punishment. It will probably be fairly short, probably fifteen minutes, probably twenty at the longest.

*Jones*, 788 S.W.2d at 835. The court of appeals held that the trial court's comment violated article 38.05 of the Code of Criminal Procedure because the "only reasonable interpretation which can be placed on the judge's statement is that, at least in his mind, the guilt of the appellant had already been firmly established and that very little time would be tolerated in assessing punishment." *Id.* at 836; *accord Brown v. State*, 122 S.W.3d 794, 798 & n. 9 (Tex.Crim.App.2003) (giving the facts in *Jones* as an "obvious example" of statements by a trial court that would violate article 38.05), *cert. denied*, 541 U.S. 938, 124 S.Ct. 1678, 158 L.Ed.2d 359 (2004).

In *Hernandez*, during closing argument, the State objected to a statement by defense counsel and asked the court to admonish counsel to stay in the record. *Hernandez*, 507 S.W.2d at 211. The trial judge then gave the following admonishment to counsel:

Court: Counsel, I have repeatedly told you not to go outside the record. We don't care whether he did or didn't try to get in the Marines. That's outside the record, counsel.

Defense: Judge, first of all, I disagree with the Court on the law. I would like the record to reflect that we would like to object to the record and that his character was brought out when we put him on the witness stand.

Court: That's fine. *You can try that on appeal.*

*Id.* (emphasis added). The court of criminal appeals held that the trial court's remark carried "the implication that appellant's conviction was a foregone conclusion." *Id.* However, although the court of criminal appeals determined that the remark violated article 38.05, it held that any error was cured by the court's instruction to the jury. *Id.* at 211–12.

First, we note that in both *Hernandez* and *Jones*, the issue was whether the trial court's comments violated article 38.05, not whether the trial court's comments constituted fundamental error. Second, looking at the context of the statements, unlike in *Hernandez* and *Jones*, the trial court's statements do not imply that the guilt of the appellant had already been firmly established. Looking at the record and the context of the comments, it is clear that the judge was not specifically commenting on the evidence itself, but was merely, after twelve objections and the refusal to follow her instructions, expressing her frustration with J.G.'s defense attorney. We hold that the trial court's comments do not rise to the level of fundamental error.

### CERTIFICATION OF THE PETITION

J.G. complains that the trial court erred by allowing the State to amend its petition without having the grand jury re-certify it. According to J.G., the petition should have been re-certified because the State dropped one of the crimes alleged in the petition, indecency with a child by exposure, because the State handwrote "Texas" on the petition, and because the State changed the spelling of J.G.'s first name.

The petition filed by the State and certified by the grand jury alleged both aggravated sexual assault and indecency with a child by exposure. Because indecency with a child by exposure is not one the offenses eligible for determinate sentencing under section 53.045 of the Juvenile Justice Code, the State abandoned the charge of indecency with a child by exposure. J.G. argues that because the petition included an offense not eligible for determinate sentencing, the grand jury certification is void, and as such, the trial court had no jurisdiction over the case. We disagree.

Section 53.045 of the Juvenile Justice Code provides that a prosecuting attorney may refer the petition to the grand jury if the child has engaged in delinquent conduct that constitutes "habitual felony conduct" or violates certain criminal offenses listed in the section.[4] *See* TEX. FAM.CODE ANN. § 53.045(a) (Vernon 2002). A juvenile court may not impose a determinate sentence unless (1) the prosecuting attorney refers the petition to the grand jury; (2) the grand jury approves the petition and certifies its approval; and (3) the grand jury's certification is entered in the record. *Id.* § 53.045. If the State's petition was not approved by the grand jury, then the trial court is without jurisdiction to impose a determinate sentence. *See id.* § 54.04(d) (Vernon Supp.2004–05). Conversely, when these requirements are met, the trial court may impose a determinate sentence with a possible transfer to the institutional division or the pardons and paroles division of the Texas Department of Criminal Justice. *See id.*

Here, the other crime alleged in the petition, aggravated sexual assault, is a crime for which a juvenile may be assessed a "determinate sentence" under section 53.045(a). *See id.* § 53.045(a)(5) (Vernon 2002). With respect to that offense, all of the above-described requirements were met. Thus, with respect to the aggravated sexual assault offense, the grand jury did have the authority to certify the petition.

Nevertheless, J.G. argues that despite the State abandoning the indecency by exposure allegation, because it was included in the petition, the grand jury's certification of the petition was a nullity. For support, J.G. relies exclusively on *In re S.D.W.*, 811 S.W.2d 739 (Tex.App.-Houston [1st Dist.] 1991, no writ.). In that case, the State filed a multi-count petition alleging that the juvenile engaged in delinquent conduct by committing murder and aggravated robbery. *Id.* at 742. At a detention

---

4. Those offenses are the following: murder; capital murder; manslaughter; aggravated kidnaping; sexual assault; aggravated sexual assault; aggravated assault; aggravated robbery; injury to a child, elderly or disabled individual, if the offense is punishable as a felony, other than a state jail felony; felony deadly conduct involving discharging a firearm; certain offenses involving controlled substances; criminal solicitation; indecency with a child by contact; criminal solicitation of a minor; criminal attempt if the offense attempted was murder, capital murder, or an offense listed by section 3g(a)(1), article 42.12; arson, if bodily injury or death is suffered by any person by reason of the commission of the conduct; and intoxication manslaughter. TEX. FAM.CODE ANN. § 53.045(a)(1)-(16) (Vernon 2002).

hearing, the prosecutor stated on the record that a grand jury had approved the petition the previous day. *Id.* at 743. The State then moved to waive count III of the petition, which alleged a "capital murder charge." *Id.* After researching the law and determining that the charge was not a capital murder charge but merely a felony murder charge, the State "readmitted its petition to include that paragraph." *Id.* On appeal, the defendant argued that the trial court's judgment was void because "the State did not present the second amended petition to the grand jury." *Id.* at 744. According to the defendant, because "the State waived one of the murder allegations contained in the original petition, when the State reasserted the murder allegation in the amended petition, it was required to again bring the petition before the grand jury." *Id.* The First Court of Appeals agreed, holding that "the amended petition, which included an allegation that previously had been waived, should have been presented to the grand jury." *Id.* According to the court, its "holding is supported by the fact that, not only was the amended petition not presented to the grand jury for approval, but also, the record is devoid of any written indication the original petition was ever presented to the grand jury." *Id.* Although the prosecutor had made numerous oral statements that the original petition had been approved by the grand jury, there was nothing in the record to indicate that the grand jury approved the petition. *Id.* The court held that "a prosecutor's oral representations of approval by a grand jury, even coupled with the assent of a defendant's counsel, is not a 'certification' within the meaning of the statute." *Id.* Without certification of grand jury approval, and the entry of such certification into the record, the trial court was without jurisdiction to impose a determinate sentence. *Id.*

Here, however, the record does contain a certificate of approval regarding the original petition. *See In re R.H.*, No. 04–97–00706–CV, 1998 WL 484695, at *2 (Tex.App.-San Antonio 1998, no pet.) (not designated for publication) (distinguishing *In re S.D.W.* by noting that the record in that case did not even contain a certificate of approval). Furthermore, in *S.D.W.*, the State attempted to prosecute the juvenile for a charge that had been expressly waived. Here, the State did not attempt to prosecute J.G. for the waived indecency by exposure offense. Moreover, the strict prohibition against amendment of pleadings in criminal cases is not applicable in juvenile proceedings. *In re K.H.*, No. 04–04–00924–CV, 2005 WL 3396588, at *2 (Tex.App.-San Antonio Dec.14, 2005, no pet. h.). The State is permitted to amend its petition at such time, and under such circumstances, as are basically fair to the minor. *Id.; see Carrillo v. State*, 480 S.W.2d 612, 615 (Tex. 1972); *In re G.A.T.*, 16 S.W.3d 818, 823 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). Here, no offense was added; instead an offense was abandoned. *See In re R.H.*, 1998 WL 484695, at *2 ("Because the amended petition charged no additional or different offense than the original petition approved and certified by the grand jury and the record reveals no prejudice to R.H.'s substantial rights, the amended petition was not required to be approved and certified by the grand jury."). Nothing in the record indicates that abandoning the indecency by exposure offense was unfair to J.G.

J.G. also complains that the State wrote the word "Texas" on the petition after the name of the city, "Tilden." The prosecutor testified under oath before the trial court that during the presentation before the grand jury, she noticed that "Texas" had been omitted. She, therefore, correct-

ed it in front of the grand jury members before the grand jury certified it. Thus, the petition with the word "Texas" was certified by the grand jury.

■ Finally, J.G. complains that the State changed the spelling of J.G.'s first name. In the State's petition, J.G.'s first name was not spelled consistently. Seven times in the petition, it was spelled with an "h" included in the name. However, on page two of the petition, the "h" was omitted twice. Before trial began, the State moved to have those two instances corrected to include the "h". J.G. argues that these two interlineations should have been approved by the grand jury. We disagree. J.G. has not alleged that he was misled by the discrepancy in the spelling. *See In re R.H.*, 1998 WL 484695, at *2. And, nothing in the record indicates that the correction of J.G.'s first name was unfair to him. *See In re K.H.*, 2005 WL 3396588, at *2.

### Sandra Garcia and Sally Serrata

■ J.G. next argues that the trial court erred in not allowing Sally Serrata and Sandra Garcia to testify. We review a court's decision to admit or exclude evidence for abuse of discretion. *Rachal v. State*, 917 S.W.2d 799, 816 (Tex.Crim.App. 1996); *Aguilera v. State*, 75 S.W.3d 60, 64 (Tex.App.-San Antonio 2002, pet. ref'd). The trial court abuses its discretion when it acts without reference to any guiding rules and principles, or acts in a manner that is arbitrary or capricious. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim.App.1991). If the trial court's decision is within the bounds of reasonable disagreement, we will not disturb it on appeal. *Id.*

#### B. Sandra Garcia

■ Outside the presence of the jury, Sandra Garcia testified that during a birthday party for J.G.'s younger sister, she witnessed Z.H. playing with Barbie dolls. According to Garcia, the dolls were naked, and Z.H. was "more or less" simulating sex by placing the dolls one on top of the other. The State objected to Garcia's testimony, arguing that it was inadmissible pursuant to Texas Rule of Evidence 412. The trial court agreed and sustained the objection.

Rule 412 provides in pertinent part that "[i]n a prosecution for sexual assault or aggravated sexual assault, or attempt to commit sexual assault or aggravated sexual assault, reputation or opinion evidence of the past sexual behavior of an alleged victim of such crime is not admissible." Tex.R. Evid. 412(a). Evidence of specific instances of an alleged victim's past sexual behavior is also not admissible unless the following is shown:

(1) such evidence is admitted in accordance with paragraphs (c) and (d) of this rule;

(2) it is evidence:

 (A) that is necessary to rebut or explain scientific or medical evidence offered by the State;

 (B) of past sexual behavior with the accused and is offered by the accused upon the issue of whether the alleged victim consented to the sexual behavior which is the basis of the offense charged;

 (C) that relates to the motive or bias of the alleged victim;

 (D) is admissible under Rule 609; or

 (E) that is constitutionally required to be admitted; and

(3) its probative value outweighs the danger of unfair prejudice.

Tex.R. Evid. 412(b).

In his brief, J.G. argues that Garcia's testimony "should have been admissible under rule 412 to rebut or impeach the testimony of State's expert Paula Rosen-

stein." J.G., however, does not argue how Garcia's testimony is evidence that meets the requirements of rule 412(b)(2)(A)-(E). *See* Tex.R.App. P. 38.1(h). Nor, does J.G. argue how the probative value of Garcia's testimony outweighs the danger of unfair prejudice. *See id.* As such, J.G. has not shown how the trial court abused its discretion in determining that the testimony of the Barbie incident was inadmissible under rule 412.

### B. *Sally Serrata*

■ Also outside the presence of the jury, Sally Serrata testified that when Sheriff Thomas "walked in and sat down for our meeting, he said that these kids had been watching a pornographic movie when this event took place." On appeal, J.G. argues that Serrata's testimony was admissible under Texas Rules of Evidence 412, 607, and 801(e)(2)(c). Even if the trial court should have allowed Serrata to testify about Sheriff Thomas's statements, any error by the trial court was harmless. *See* Tex.R.App. P. 44.2(b).

At trial, Z.H., E.M., and *even J.G., himself,* testified that the movie they were watching was *Eight–Legged Freaks,* a children's movie. This simply was not a fact in dispute at trial. Indeed, although Regina H. testified that she had been concerned that the boys might have been watching something they were not allowed to watch (specifically a Playstation 2 game), when she looked at the television, she noticed that the movie was fine. Therefore, any error by the trial court was harmless.

### BOLSTERING

■ J.G. complains that the trial court erred by allowing the State to bolster Z.H.'s testimony by allowing rebuttal testimony of Regina H. and Z.H. For support, J.G. cites to pages 53–62 of volume VII of the reporter's record. The record reflects that during Regina H.'s testimony, J.G. did not object to "bolstering." Thus, any complaint with respect to Regina H.'s testimony has not been preserved for appellate review. *See* Tex. R.App. P. 33.1. With respect to Z.H.'s testimony, J.G. did object to bolstering. However, a general objection to "bolstering" is not sufficient to preserve error, because it does not sufficiently inform the trial court of the nature of the objection. *Montoya v. State,* 43 S.W.3d 568, 573 (Tex. App.-Waco 2001, no pet.); *Biddy v. State,* No. 03–01–00182–CR, 2002 WL 533652, at *3 (Tex.App.-Austin 2002, no pet.) (not designated for publication). Moreover, even if the trial court erred in allowing Z.H. to testify as a rebuttal witness, any error is harmless. *See* Tex.R.App. P. 44.2(b). Z.H.'s testimony was very short; it is reflected on only three pages of volume VII. And, the essence of the testimony was that Z.H. understood the difference between an object being placed "inside" something else. Given the direct testimony of Z.H. and E.M. and the duration and content of Z.H.'s rebuttal testimony, J.G.'s substantial rights were not affected. *See id.*

J.G. also argues on appeal that the probative value of the testimony in question was substantially outweighed by the prejudicial effect to the defense. At trial, however, J.G. only made a generally objection to "bolstering"; J.G. did not object under Texas Rule of Evidence 403. As such, J.G. did not preserve error for appeal. *See* Tex.R.App. P. 33.1.

### EXCESSIVE LEADING QUESTIONS

■ According to J.G., the trial court erred in allowing "excessive leading questions" by the State during its examination of its witnesses. Specifically, J.G. complains of leading questions during the direct examination of Paula Rosenstein, the

State's expert witness. J.G. argues that these leading questions unduly prejudiced him, constituting reversible error. We disagree.

 The rationale for the general prohibition on leading questions when eliciting direct testimony from a witness is to prevent an attorney from testifying and then merely asking for agreement from the witness. TEX.R. EVID. HANDBOOK (4th ed.2001). The use or prohibition of leading questions rests in the discretion of the court. *Stevens v. State*, 671 S.W.2d 517, 521 (Tex.Crim.App.1984). When the court allows a confusing or incorrect impression to be clarified by the use of leading questions reversible error exists only if appellant was unduly prejudiced by the questions. *Id.*

J.G. complains that the State was allowed to use excessive leading questions throughout the trial but, except for the State's examination of Rosenstein, he does not cite specific instances where leading questions were allowed or show how he was prejudiced as a result. However, J.G. does specifically complain about the State's examination of Rosenstein reflected on pages fifty-seven to sixty-three of volume six of the reporter's record. Those pages of the reporter's record reflect that J.G.'s defense attorney objected ten times to leading questions. Although one of these objections was sustained, one was also made by defense counsel before the State had even asked a question. In overruling defense counsel's many objections, the court explained that it did not believe the questions were suggesting the answer to Rosenstein. We agree. The State's questions were not an attempt to testify and gain witness compliance. In other words, the State was not leading the witness so that the procured testimony came out as an orchestrated attempt to testify on behalf of the witness. And, given the consis-

tency of Rosenstein's testimony, we see no harm to J.G. and no abuse of the court's discretion in allowing the questions. *See Stevens,* 671 S.W.2d at 521.

## FACTUAL SUFFICIENCY

 J.G. argues that the evidence is not factually sufficient to support the jury's finding that he committed aggravated sexual assault. A person commits aggravated sexual assault if the person causes the penetration of the mouth of a child by the sexual organ of the actor or causes the mouth of a child to contact the sexual organ of another person, including the actor, and the victim is younger than fourteen years of age. TEX. PEN.CODE ANN. § 22.021 (Vernon Supp.2002).

 In conducting a factual-sufficiency review, rather than viewing the evidence in the light most favorable to the prosecution, our review is a neutral one of the evidence. *Zuniga v. State,* 144 S.W.3d 477, 481 (Tex.Crim.App.2004). There is only one question to be answered in a factual-sufficiency review: considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt? *Id.* at 484. There are two ways in which the evidence may be factually insufficient. *Id.* First, when considered by itself, evidence supporting the verdict may be too weak to support the finding of guilt beyond a reasonable doubt. *Id.* Second, there may be both evidence supporting the verdict and evidence contrary to the verdict. *Id.* Weighing all the evidence under this balancing scale, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard could not have been met, so the guilty verdict should not stand. *Id.* at 485.

Here, J.G. argues that the evidence is factually insufficient, pointing to the testimony of Regina H., Z.H., and E.M. First,

J.G. emphasizes that based on personal knowledge, Regina H. could only testify that Z.H.'s bedroom door was blocked and that when she entered the room, Z.H. was in his underwear while J.G. was fully dressed. And, according to Regina H., at the time of the incident, she did not think much of her son being in his underwear because "he always runs around in his underwear at the house." Second, J.G. points to Regina H.'s testimony where she admitted on cross-examination that during Z.H.'s video interview, he never mentioned oral sex; only after she asked Z.H. directly did he say that J.G. placed his penis in Z.H.'s mouth. Third, J.G. points to Regina H.'s testimony that when she asked Z.H. how many times J.G. had done this, Z.H. replied, "Two, three, seventy thousand times." Fourth, J.G. points to Z.H.'s testimony in response to a question by the State of how often J.G. came over to Z.H.'s house. Z.H. replied, "Three different days." J.G. points out that the State then led Z.H. by asking him, "When you say he came [over on] three different days, are you talking about that this happened?" Z.H. replied, "Yes, talking about that." The State then stated again, "That these bad things happened to you?" Z.H. responded, "Uh-huh." Thus, J.G. argues that only after being led by the State did Z.H. respond that J.G. had committed sexual contact on three different occasions. Fourth, J.G. points to Z.H.'s testimony that J.G. had forced him to put J.G.'s penis in his mouth and that J.G. had said, "Do it." However, J.G. notes that E.M. testified that J.G. had said to her, "Look at this," and that J.G. testified that he did not say anything to Z.H. Fifth, J.G. emphasizes that E.M. never testified that J.G. put his penis in Z.H.'s mouth; instead, she testified that Z.H. "put his mouth *on* [J.G.'s] pee-pee." (emphasis added).

In reviewing the record, we hold that the evidence is factually sufficient. When Z.H. testified, he stated clearly and unequivocally that J.G. had placed his penis into Z.H.'s mouth.

Q: What happened?

A: [J.G.] touched my private parts.

Q: He touched your private parts?

A: Uh-huh.

Q: And when you say your "private parts," what are you talking about?

A: My penis and my butt.

Q: Okay. And were your clothes on or off?

A: On.

Q: Okay. What else happened?

A: He forced me to put his penis in my mouth.

Q: He did what?

A: He put my penis in my mouth.

Q: He put your penis in your mouth?

A: No. His penis in my mouth.

E.M., corroborated Z.H.'s testimony. Although E.M. did use the word "on," she clearly testified about the sequence of events:

Q: Where was [J.G.]?

A: He was laying [sic] down right there and [Z.H.] was sitting right there.

Q: [J.G.] was laying down and [Z.H.] was sitting right there. And what was going on? What was happening?

A: [J.G.] said, "Look at this," and put his zipper down on his pants.

Q: Okay. He said, "Look at this." And is he talking to you?

A: Yes.

Q: And so did you look at him?

A: (Nodding head). Yes.

Q: And you said his zipper was undone on his pants?

A: Yes.

Q: And what was—what happened after his zipper was undone?

A: He pulled his pants down and made [Z.H.] put his mouth on [J.G.'s] pee-pee.

The State's evidence consisted of two eye-witness accounts of the events that occurred on the day in question, expert testimony regarding abused children, and the testimony about Z.H.'s outcry to his mother, Regina H. While J.G. argues that it was only after prompting from his mother that Z.H. made a full outcry, this does not make the evidence insufficient. Paula Rosenstein, during testimony, discussed the fear, anxiety, shame, and self-blame that children experience when sexual abuse occurs. It is not surprising that Z.H. was reluctant to make a full outcry upon initial questioning as he was only five years old when the alleged offense happened and was afraid that he would get in trouble if he told anyone.

Although J.G. emphasizes that Z.H. said the abuse occurred seventy-thousand times while also stating that he remembered J.G. being at his house on only three occasions, Rosenstein explained that it is common in children to not be able to recall certain dates and numbers because they have a different concept of time than adults and traumatic events are often suppressed. According to Rosenstein, if a child says that he was abused seventy-thousand times, in a child's mind, it would just mean that it happened on many different occasions.

Furthermore, the fact that E.M. testified that J.G. said, "Look at this," and did not recall him saying anything else may be attributed to age of the witness, who was six years of age when she testified, the traumatic nature of the event, the time lapse between the event and trial, and differences in memory between children and adults.

It was the jury's domain to determine whether J.G. and E.M. were credible witnesses. *See Jones v. State*, 944 S.W.2d 642, 648 (Tex.Crim.App.1996). In this case, both the State and J.G. presented conflicting evidence. The only evidence that could have exonerated J.G. turned on the jury's acceptance of J.G.'s version of events. The jury, however, chose to resolve the conflicting evidence in the State's favor. We, therefore, hold that the evidence is factually sufficient.

### COMMITMENT TO THE TEXAS YOUTH COMMISSION

Finally, J.G. complains that there was insufficient evidence to support the trial court's finding that reasonable efforts were made to prevent or eliminate the need for removal from the home and that J.G. in his home could not be provided the quality of care and level of support and supervision that J.G. needed to meet the conditions of probation. As a threshold matter, the parties disagree on the appropriate standard of review. The State argues that an abuse of discretion should apply under our holding in *In re K.T.*, 107 S.W.3d 65, 74–75 (Tex.App.-San Antonio 2003, no pet.). J.G., on the other hand, attempts to distinguish *K.T.* by emphasizing that it involved an indeterminate sentence assessed by the court while this case involves a determinate sentence assessed by a jury. Based on this distinction, J.G. argues that the appropriate standard of review is the criminal standard for sufficiency of the evidence.

As we explained in *In re A.W.*, 147 S.W.3d 632, 636 (Tex.App.-San Antonio 2004, no pet.), we need not reach this issue of which standard should apply under section 54.04(c) because the appellant is complaining about the trial court's findings under section 54.04(i):

We need not reach the issue of which standard should be employed when reviewing a jury's findings that a child is in need of rehabilitation or that the protection of the public or the child requires that disposition be made pursuant to Family Code section 54.04(c) because those are not the findings about which appellant complains on appeal. Instead, appellant's specific complaint is that the evidence is factually insufficient to support a finding that it is in his best interest to be placed outside his home and that he, in his home, cannot be provided with the quality of care and level of support and supervision he needs to meet the conditions of his probation. These are findings entrusted to the trial court pursuant to Family Code section 54.04(i).[5] Therefore, we follow this court's holding in *In re K.T.*

Like in *A.W.*, J.G. is complaining about the trial court's findings under subsection (i). Thus, we also follow this court's holding in *In re K.T.*

■■■ Under *In re K.T.*, in reviewing the trial court's disposition order, we apply an abuse of discretion standard, divorced from evidentiary standards of legal and factual sufficiency. *In re K.T.*, 107 S.W.3d at 74–75. The abuse of discretion standard requires that we "view the evidence in the light most favorable to the trial court's ruling," affording almost total deference to findings of historical fact that are supported by the record. *Id.* at 75. However, when the resolution of the factual issue does not turn upon an evaluation of credibility or demeanor, we review the trial court's determination of the applicable law, as well as its application of the appropriate law to the facts it has found, de novo. *Id.*

■■■ J.G. complains that the State did not make reasonable efforts to prevent or eliminate the need for his removal and that the evidence was insufficient to support the court's finding that his home could not provide the quality or care and level of support and supervision necessary to meet the conditions of probation. In reviewing the record, we find no abuse of discretion by the trial court.

During the disposition phase of the trial, Timothy Trowbridge, the juvenile probation officer assigned to J.G., testified regarding his involvement with J.G. and his family. According to Trowbridge, J.G. was living with his mother and attending an alternative education program. E.M.'s mother, the sixth-grade teacher of the alternative education program, was J.G.'s teacher. J.G. did not attend mainstream classes and was the only juvenile in the classroom "receiving services" at that time. He was not allowed to interact with the

---

5. The Juvenile Justice Code provides that certain findings may be made by either the court or the jury. *See* TEX. FAM.CODE ANN. § 54.04 (Vernon Supp.2005). However, if the court places a child on probation outside the home or commits a child to TYC, it is the court's responsibility to determine that placement outside the child's home is in the child's best interest and that the child cannot receive the appropriate level of care, support, and supervision in his home. *Id.* § 54.04(i). In *In re A.W.*, 147 S.W.3d at 636 n. 1, the trial court made the section 54.04(i) determinations, while the jury made only two findings: (1) that appellant "is in need of rehabilitation or that the protection of the public or of [appellant] requires that a disposition be made," and (2) that appellant be sentenced "to commitment to the Texas Youth Commission with possible transfer to the Institutional Division of the Texas Department of Criminal Justice for 10 years (any term of years not to exceed 40 years)." Likewise, here, the trial court made the section 54.04(i) determinations while the jury only made the two findings discussed above. The only difference was, here, the jury found that appellant should be sentenced to ten years and one day with a possible transfer to the Institutional Division of the TDCJ.

other children and wore an electronic monitor and surveillance device. Trowbridge listed some of the criteria he used to make his determination that J.G. should be committed to TYC: "the nature of the offense, whether or not there might be resources available in the community, and [whom J.G.] might have to come in contact with outside the community." Trowbridge also explained that in the small community in which J.G. resided, there was no available counseling. Although J.G. could receive counseling in Corpus Christi, it would be for only one and a half hours per week. On the other hand, T.Y.C. requires a minimum of ten hours per week of "confrontational, intensive counseling," with some peer group counseling. TYC also requires year-round schooling and academic success. Also, before J.G. would be eligible for parole, he would have to successfully complete the sex offender treatment program. Further, Trowbridge expressed concerns that J.G., if left at home, would be exposed to contact with his younger sister who was the same age as Z.H. Trowbridge also testified that he did not believe J.G. could receive the necessary support at home that he would need to complete the conditions of his probation.

On cross examination, Trowbridge explained why the alternative facilities would be inadequate to treat J.G. He explained that a treatment facility in Rockport was inadequate because the treatment was not long-term. And, the facility was not a confinement facility and did not "provide intense sex offender therapy." Trowbridge expressed the same concerns with a boot camp treatment facility located in Rockport, Texas. The facility was not a long-term residential sex offender treatment program; the program lasted only six months. At the close of Trowbridge's testimony, he stated firmly that committing J.G. to T.Y.C. was in the best interest of the community and J.G.

J.G. emphasizes that there is a preference for keeping a child in his family environment, and that a child should be separated from his parents only when necessary for the child's welfare or in the interest of public safety. TEX. FAM.CODE ANN. § 51.01(5) (Vernon 2002). However, based on the evidence, we hold that the trial court did not abuse its discretion in finding that reasonable efforts were made to prevent or eliminate the need for removal from the home and that J.G. in his home could not be provided the quality of care and level of support and supervision that J.G. needed to meet the conditions of probation.

### CONCLUSION

Having determined that J.G.'s issues lack merit, we affirm the trial court's judgment.